Filed 12/28/23 In re T.R. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re T.R.,<br><br>a Person Coming Under the Juvenile Court Law. | B322616<br><br>(Los Angeles County Super. Ct. No. 22CCJP01327) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSE R.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Charles Q. Clay, Judge. Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Avedis Koutoujian, Deputy County Counsel, for Plaintiff and Respondent.

————————————

Jose R. (Father) asks us to reverse the juvenile court's jurisdictional findings, including that he and J.M. (Mother) each physically abused their then-15-year-old daughter, T.R., and that Father failed to protect T.R. from Mother's physical abuse. Father likewise appeals the court's order removing T.R. from his custody, requiring Father to participate in counseling and parenting classes, and restricting his visits with T.R. to one hour per week of monitored visitation in a therapeutic setting. Father finally claims we should reverse because the Los Angeles County Department of Children and Family Services (DCFS) failed to adequately inquire of maternal extended family members whether T.R. was an Indian child as defined by the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.).[1] Mother is not a party to this appeal.[2]

As we describe below, we consider only some of Father's jurisdictional challenges due to issues of standing. We conclude substantial evidence supported the juvenile court's assertion of jurisdiction and the removal order, that Father forfeited his

————————————

[1] "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

[2] Mother filed a no-merit brief pursuant to *In re Phoenix H.* (2009) 47 Cal.App.4th 835. Her appeal, case No. B321286, was dismissed in March 2023.

challenge to the case plan, and that the court's visitation orders were not an abuse of discretion. Finally, although DCFS did not comply with its duty of initial ICWA-related inquiry under Welfare and Institutions Code[3] section 224.2, subdivision (b), this error was harmless. We thus affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Family and Child Welfare History

We recite only those facts necessary to our disposition. Mother and Father were born in El Salvador and met there in 2002. The family migrated to the United States in 2007 or 2009, after T.R. was born.

In March 2022, T.R. lived with Mother, Father, eight-year-old brother John R., and three-year-old sister A.R. T.R.'s adult half-sister, Ana M., lived with maternal grandmother intermittently since 2008. Mother had agreed to let Ana live with maternal grandmother due to Ana's allegations that Father had sexually abused her.

In November 2017, DCFS received a report that nearly nine years prior, when the family lived in El Salvador, Father abused Ana, T.R., and John. The reporter was unaware of current abuse, and the referral was evaluated out as historical.

In February 2018, DCFS received two referrals concerning the family. Ana, then approximately 16 or 17 years old, was on psychiatric hold. Mother did not want Ana to return to live with maternal grandmother. Ana threatened to commit suicide if she were forced to live with Mother. The reporter stated Father

---

[3] All unspecified statutory references are to the Welfare and Institutions Code.

3

sexually and emotionally abused Ana when the family resided in El Salvador. Ana also witnessed domestic violence between Mother and Father but denied abuse of the other children. A dependency matter was opened, and the juvenile court sustained an allegation that Mother emotionally abused Ana by involving her in Mother's conflict with maternal grandmother. In October 2019, the juvenile court terminated jurisdiction with a home of parent order.

**B.    Events Giving Rise to the Section 300 Petition**

On March 22, 2022, DCFS received a referral that two days earlier Mother had been drunk and yelled at Ana and T.R., calling them useless and parasites, and threw several objects at them.

On March 29, 2022, DCFS received a report that T.R. was concerned about a social worker speaking with her because, among other things, Mother would hit T.R. if she told the truth. The report included that T.R. was developing an eating disorder and had made suicidal statements.

A social worker interviewed T.R. at a police station. T.R. stated Mother hit her for every little thing, including when her parents argued and T.R. did not side with Mother. T.R. acknowledged she had suicidal thoughts a few months ago, including cutting her veins or throat, because her parents said they would change but did not. T.R. claimed her parents argued a lot but could not remember when they last did so. During an argument, Mother told Father that he "like[d] [T.R.] because [she] is getting pretty." Mother last hit T.R. on March 26, 2022, because T.R gave Mother pink salt instead of white salt. Mother hit T.R. with a closed fist to the head, and T.R. developed a bump as a result. Father was not home at the time, but John and A.R.

4

saw Mother hit T.R. and cried for Mother to stop. T.R. also stated that a week prior, Mother kicked her thigh. T.R. could not recall the details of this incident but stated she had a bruise as a result. T.R. stated Father either was not present when Mother hit her, or when he was present did nothing to intervene.

According to T.R., Father last hit her in January 2022 because he believed she failed a biology test. He punched her approximately five times with a closed fist. Mother did not observe the incident. T.R. stated her parents do not hit A.R. or John.

A police officer observed a dime-size, light green bruise on T.R.'s left upper thigh, a linear one-inch scar on her forehead, a healed scar on her cheek, and a mark on her hand. T.R. stated the forehead scar was from Thanksgiving 2021, when Mother threw a ruler at her, although T.R. did not recall why. A slap by Mother caused the scar on her cheek. According to the police report, an officer also felt a bump on the back of T.R.'s head.

T.R. claimed she would use a kitchen knife to kill herself if she went back home with her parents. The parents agreed to a safety plan for T.R. to stay with maternal grandmother.

Ana, who had stayed at Mother and Father's home for over a month, confirmed she saw Mother hit T.R. a lot. The last time was on March 27, 2022. T.R. had been using Ana's cell phone to text friends, and Mother slapped T.R. hard on the shoulder. Mother also hit T.R. approximately two weeks earlier because Ana and T.R. were sharing clothes. Ana observed Mother grab T.R. by the hair and slap T.R. in the face. She also reported that when T.R. was sleeping, Mother slapped T.R. on the face, grabbed T.R. and threw her on the floor, and kicked T.R. approximately five times. Ana could not recall when or why this incident

happened. Ana reported Father hit T.R. with a belt but did not know why, or where on her body he struck her.

John denied witnessing any fighting amongst family members. He also denied being hit with objects or witnessing physical discipline of T.R. or A.R. To discipline John, the parents restricted phone or television use. He stated he liked living with his parents and felt safe. Neither John nor A.R. had any marks or bruises on their bodies.

A.R. told the social worker that Mother and T.R. fought approximately three times. A.R. pointed to her cheek and forearm and said T.R.'s name and the Spanish word for blood. A.R. denied that Mother fought with her, Father, John, or Ana.

Father stated that he disciplined the children by restricting cell phone or television use. He acknowledged that years ago, he hit T.R. with a belt, but was not sure when or why. Father stated that with respect to T.R.'s biology test, he slapped T.R. on her upper thigh and buttock with an open hand and twice gave her a slight push on the back with an open hand. Father stated he stopped Mother from hitting T.R. multiple times and intervened approximately twice a week. Father believed Mother needed help with anger management. He denied seeing marks or bruises on T.R.'s body and noted he would not allow that. He believed the last time Mother hit T.R. was a month prior, related to T.R. sharing Ana's clothes, and that Mother also had disciplined T.R. for cutting T.R.'s clothing to shorten it. He acknowledged it was possible that Mother was jealous of T.R. as Mother was possessive of Father. He believed Ana and maternal grandmother manipulated T.R. because they wanted T.R. to live with them. He denied any substance abuse or domestic violence. He admitted that he touched Ana inappropriately once when

John and Ana were sitting with him on the sofa.  Father reached for John and accidentally touched Ana.

Mother believed Ana influenced T.R. to falsify allegations of abuse and self-harm.  Mother denied hitting T.R. daily, kicking her in the thigh, or hitting her in the back of the head with a closed fist.  Mother admitted she slapped T.R. on the shoulder with an open hand a few weeks ago because T.R. was disrespectful and screamed at Mother when Mother told her not to share clothes with Ana.  Mother also acknowledged that approximately a year prior, she hit T.R. with a belt for cutting a shirt and a sweater into crop tops.  Mother and Father each stated that T.R. scarred her forehead as a result of falling off a mechanical bull at a party approximately four years ago.

Mother said Father did not hit T.R. or the other children to discipline them, and did not know whether Father hit T.R. with respect to her biology test.  Father hit Mother approximately 12 years ago, but there was currently no violence between them.

Maternal grandmother stated that she observed Mother hit T.R. "on some occasions," but not to the extent it left marks or bruises.  She witnessed Mother slap T.R. on the shoulder two weeks prior.

Two neighbors stated the family sometimes played loud music but that they never heard fights or screaming.

T.R. told a forensic evaluator that Mother caused the bruise on her right thigh, scars on her forehead and cheek, and the mark on her hand.  The evaluator reported that some of the statements about how T.R. sustained these injuries were not consistent with the marks, but that T.R. was consistent throughout the interview in describing Mother's abuse.

Although the parents originally agreed to have T.R. stay with maternal grandmother for a few days, they changed their minds because they believed maternal grandmother and Ana were influencing T.R. Instead, the parents identified maternal second cousin, Erika C.[4] as a person to care for T.R. during the safety plan. Erika agreed to have T.R. stay in her home. Father agreed that, if needed, he would live elsewhere until the family completed services and reunified.

The social worker went to T.R.'s school to discuss the safety plan with her. T.R. indicated she did not want to be placed with Erika because she was concerned her parents would go to Erika's home. The social worker explained T.R.'s parents would not be permitted to contact her or Erika, and T.R. believed Erika would follow that guideline. While the social worker was at the school, maternal grandmother texted the social worker multiple times, claiming T.R. would kill herself if she were not placed with maternal grandmother. The social worker explained T.R. was not expressing suicidal ideations. Erika and Mother separately reported maternal grandmother telephoned them. According to Erika, maternal grandmother threatened to report to the police that T.R. had been kidnapped and was going to kill herself. According to a police call log, Ana and maternal grandmother called law enforcement. Erika showed the police proof of custody, and the police determined T.R. was not in any danger and there was no evidence of a crime. The following day, T.R. reported she felt safe in Erika's home and denied any suicidal ideations. She identified a maternal aunt, Esmerelda, as someone who she would want to live with if she could not live with maternal

_____

[4] DCFS also referred to Erika as Edith S.

8

grandmother. Mother and Father stated they did not want T.R. to live with maternal grandmother, Ana, or Esmerelda due to longstanding, hostile family dynamics.

On April 3, 2022, maternal grandmother reported to DCFS that T.R. was with a family member who could not handle T.R.'s suicidal ideations and eating disorder. Maternal grandmother indicated she wanted T.R. to live with her.

On April 5, 2022, the day the safety plan was to expire, T.R. stated if she could not live with maternal grandmother, she would kill herself. The juvenile court removed T.R. from her parents and placed her with Erika. T.R. informed the social worker that she wanted to be emancipated.

DCFS did not recommend that T.R. be placed with maternal grandmother. Maternal grandmother and Ana kept in regular contact with T.R. through a cell phone that maternal grandmother gave to her. During these contacts, they told T.R. that she would live with them, which the social worker believed created instability and confusion for T.R.

## C. The Petition

On April 7, 2022, DCFS filed a section 300 petition, alleging Mother physically abused T.R. (count a-1), Father physically abused T.R. (count a-2), Father failed to protect T.R. from Mother's abuse (count b-1), Mother failed to protect T.R. from Father's abuse (count b-2), and that Mother emotionally abused T.R. (count c-1).[5]

_____

[5] The petition further alleged that T.R.'s siblings John and A.R. were at risk due to Mother's and Father's physical abuse of T.R. and their failure to protect T.R. (counts j-1, j-2). Father did

9

**D.    Detention Hearing**

At the April 12, 2022, detention hearing, the juvenile court found that DCFS had demonstrated a prima facie case for dependency jurisdiction.  It detained T.R. from both parents, and ordered that the parents have one hour per week of monitored visits with her in a therapeutic setting.  It granted DCFS discretion to liberalize the visits to a minimum of two visits for two hours per visit.

**E.    Jurisdiction and Disposition**

1.    *The Report*

In her statements following the detention hearing, T.R. continued to maintain Mother had physically abused her and recounted some of the previously reported abuse with additional details.  With respect to the incident relating to T.R. wearing

---

not appeal from any findings or orders made in John's or A.R.'s cases.  His notice of appeal refers only to T.R.'s case number; the caption of Father's opening brief likewise refers only to T.R.'s case number and identifies only T.R. as the subject of the appeal. The appellate record includes only the minute order of the jurisdictional findings and dispositional orders relating to T.R. and not the two siblings.  Father did not file a reply brief disputing DCFS's argument that he did not appeal John's and A.R.'s cases.  (See *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2023) 94 Cal.App.5th 764, 773-774 [an appellant may "tacitly concede" an argument made in a respondent's brief by failing to respond].)  Whether Father's action and inaction as to T.R. had any impact on her siblings is therefore not before us and does not impact our resolution of T.R.'s appeal. We thus decline to address Father's arguments concerning the section 300, subdivision (j) allegations and limit our discussion to T.R.'s case.

Ana's clothes, T.R. stated Mother slapped her face. When Father observed T.R. crying with her hand on her cheek, Mother explained to Father that T.R. "was a liar and being dramatic," and punched T.R. on the shoulder in front of Father. With respect to being hit in the head with the ruler, T.R. claimed Mother threw it at her because she took too long to put away laundry. T.R. claimed John witnessed the incident but Mother threatened to hit him. Mother told T.R. to say she was injured when a box of toys fell on her. T.R. also stated that Mother kicked T.R.'s vagina while T.R. was menstruating as a form of discipline. Mother physically disciplined T.R. daily, either by punching her on the back, hitting her with a broomstick, or kicking her. Mother belittled T.R., called her trash, told T.R. that she wanted to kill her but did not want to go to jail, and said that she regretted bringing T.R. from El Salvador. T.R. stated she would rather kill herself than go back to her parents' house.

As to Father, T.R. maintained he hit her several times with his fist for failing her biology test and because he believed she "did something" to A.R. to make her cry. Father physically disciplined her at least once a month with a belt. She stated that if she accidentally broke a cup or a bottle of perfume, Father would hit her. She did not feel safe with Father and did not want to go back home. T.R. stated Father saw Mother hit her lots of times, and only defended her when Mother hit her a lot and T.R. "felt like [she] was fainting." She claimed her siblings have seen the abuse but will not acknowledge it because her parents bribe them with toys. Mother also knew when Father hit T.R. but did not intervene. T.R. told the social worker, "I had thoughts of killing myself and once I grabbed a knife and I was going to cut

myself, but I stopped because I did not want them to see me on the ground dead."

John stated he never saw Mother or Father physically abuse T.R. and that T.R. was lying about the abuse. A.R. did not give a meaningful statement as she was unable to focus on the investigator's questions. In response to the investigator asking if T.R. ever seemed sad or afraid, A.R. stated, "no, I cannot talk about that."

Mother stated she did not hit T.R. on the head or with her fist, but she did physically discipline T.R. and as Mother put it, "let my anger take me." Mother explained Ana had a sexually transmitted disease (STD), and Mother did not want T.R. sharing Ana's clothes until Ana had completed her treatment medication. T.R. walked up to Mother and "yelled at her face." Mother hit T.R. on the arm with an open hand. She maintained she did not slap or scratch T.R.'s face, pull her hair, or throw a ruler at her. Mother stated she hit T.R. with a belt twice because she had warned T.R. not to cut her clothing, but T.R. did so nevertheless. Mother denied that T.R. was afraid of Father or that she ever observed T.R. to be depressed or suicidal, and stated Ana and maternal grandmother pitted T.R. against her and Father. Mother acknowledged that she made a mistake with how she disciplined T.R. and wanted an opportunity to rectify her errors. As to whether Father hit T.R. with a belt or his hand, Mother stated she was not sure and that the investigator would need to ask Father.

Father acknowledged that Mother hit T.R. on the shoulder for talking back. He intervened and told both of them to calm down. He also acknowledged Mother hit T.R. with a belt on one occasion, but he did not recall why or when. Father denied

hitting T.R. with his fist but admitted he did push her twice because she was not listening to him. He said he hit her one time with a belt a few months ago. Father would not answer whether Mother was present or aware of this incident. Father did not allow Mother to abuse T.R. and told T.R. to call him if there were problems when he was at work. He explained that Mother and T.R. would "say things to each other."

Maternal grandmother described Mother as very aggressive and observed Mother hit and pinch T.R. and pull her hair. She stated Father took T.R. to the patio to spank T.R., and that he said he spanked her "because she is dumb." Maternal grandmother claimed Mother coached and bribed John to deny the abuse.

Ana stated she had lived at the family's home for several months but moved out. She reiterated that Mother frequently hit T.R. for no reason and kicked and choked her. She claimed Mother accused T.R. of having sex with Father. Father did "nothing" when he saw Mother hit T.R. Ana denied having had an STD or that T.R. talked back to Mother. Ana claimed Mother coached John to lie and that Mother and Father have been abusing T.R. since she was eight years old.

DCFS reported that T.R. was afraid and refused to visit her parents. DCFS recommended the juvenile court order Mother and Father to participate in individual counseling, family counseling when deemed appropriate by a therapist, parenting classes, anger management classes, and family preservation services. It further recommended that Mother participate in a psychiatric mental health evaluation.

### 2. *The Hearing*

At the June 7, 2022 combined jurisdiction and disposition hearing, Mother argued she physically disciplined T.R. but that the discipline was not as extensive as DCFS had alleged. She requested the juvenile court find there was no current risk to T.R. and dismiss the petition. In the alternative, she asked the court to conform the abuse allegation to proof and sustain a single count that Mother used inappropriate physical discipline in the past. Mother further argued removal was unnecessary as Mother agreed she would no longer use physical discipline and would attend counseling and programs. Father denied hitting T.R. with his fist and requested, if the court were to sustain the abuse allegation against him, that it amend it to reflect only that Father inappropriately disciplined T.R. on one occasion in January 2022 by hitting her with a belt. He further argued the court should strike Father from counts b-1 (relating to his alleged failure to protect) and dismiss count b-2 (relating to Father's alleged physical abuse). Father submitted to DCFS's dispositional recommendations except for one recommendation that he participate in an anger management course. Father agreed with Mother's arguments that there were reasonable means by which T.R. could be safely returned to her parents' home.

Counsel for DCFS and T.R. both argued that the court should sustain all the allegations in the petition and place T.R. with maternal grandmother. T.R.'s counsel noted that Erika "did not want [T.R.] to be placed with her."

The juvenile court sustained all counts as pleaded in the petition. It concluded returning T.R. to the home of the parents was not an appropriate disposition, and that removal was

14

necessary. In that regard, the juvenile court observed the parents' requests that T.R. be returned home "considering the statements that she's made regarding her desire not to be placed home and why," were "puzzling." The court ordered maternal grandmother, Ana, and other family members, excluding Erika, be assessed for placement. It ordered reunification and maintenance services, including that Mother participate in a anger management program, a parenting class, mental health services, and family counseling when deemed appropriate by the children's therapist. The court ordered Father to participate in a parenting program, individual counseling, and family counseling when deemed appropriate by the children's therapist. The court further ordered that each parent have a minimum of one hour of monitored visitation with T.R. per week in a therapeutic setting. It granted DCFS discretion to liberalize the visits.

## F. ICWA Proceedings

Prior to April 7, 2022, a DCFS social worker asked Mother and Father about T.R.'s Indian status and reported that the parents gave the social worker no reason to believe T.R. is or may be an Indian child. On April 11, 2022, Father filed a parental notification of Indian status form in which he indicated no knowledge of Indian ancestry for T.R., John, or A.R. Mother filed a form as to T.R. in which she indicated no knowledge of Indian ancestry.

At the April 12, 2022 detention hearing, the juvenile court referred to Mother's and Father's forms in their presence and concluded it did not have a reason to know that T.R. was an Indian child. The court ordered the parents to keep DCFS, their attorneys, and the court aware of any new information relating to

15

possible ICWA status.  No further ICWA finding is reflected in the record.

On April 27, 2022, DCFS again inquired of Mother and Father concerning Indian ancestry, and they denied any. Nothing in the record indicates maternal grandmother, Ana, or Erika were asked about T.R.'s possible Indian status.

## G.   Notice of Appeal and DCFS's Motion to Dismiss

On August 9, 2022, Father filed a notice of appeal.  DCFS argues Father filed this notice one day late and thus, we should dismiss this appeal.  Because Father has demonstrated he would have timely filed an appeal but for his attorney's error and diligently sought relief upon learning of the error, we deny DCFS's motion to dismiss.  (See *In re A.R.* (2021) 11 Cal.5th 234, 258.)

## H.   Post-appeal Events[6]

On June 7, 2023, the juvenile court terminated reunification services to Mother and Father.  In a last minute information filed September 21, 2023, DCFS reported T.R., then between 16 and 17 years old, did not want to be adopted, subjected to any legal guardianship, or live with her parents. T.R. sought to receive the benefits of "[t]he California Fostering

---

[6] Because it may bear on the parties' arguments concerning Father's standing and justiciability, we sua sponte take judicial notice of the juvenile court's June 7, 2023 minute order.  We also grant DCFS's unopposed request that we take judicial notice of certain post-adjudication documents in the underlying matter, including a December 6, 2022 minute order, DCFS's last minute information filed September 21, 2023, and an October 4, 2023 minute order.

Connections to Success Act (Assem. Bill No. 12 (2009-2010 Reg. Sess.)), often referred to as "Assembly Bill 12," [which] allows nonminor dependents to remain under the juvenile court's dependency jurisdiction and receive financial assistance until age 21 if they comply with certain statutory requirements. (Assem. Bill No. 212 (2011-2012 Reg. Sess.) . . . .)" (*In re Leon E.* (2022) 74 Cal.App.5th 222, 225.) DCFS requested that the juvenile court take the scheduled section 366.26 permanency planning hearing off calendar, and on October 4, 2023, the juvenile court did so.

The written case plan for Father required that he take an anger management course. In a post-adjudication December 6, 2022 minute order, however, the juvenile court stated it had reviewed the June 7, 2022 transcript and, "as to the order for [F]ather to complete [a]nger [m]anagement [c]lasses[,] . . . finds that . . . although it was listed on the case plan, the court did not make the order on the record."

## DISCUSSION

### A. Procedural Issues Relating to Father's Appeal of Jurisdictional Findings Against Mother

#### 1. *Standing*

Father's appeal seeks to challenge whether substantial evidence supports the juvenile court's findings concerning Mother's conduct, namely her physical abuse of T.R. (count a-1), her failure to protect (count b-2), and her emotional abuse of T.R. (count c-1). We first address DCFS's argument that Father lacks standing to appeal findings that relate to Mother's conduct as opposed to his own.

"Although standing to appeal is construed liberally, and doubts are resolved in its favor, only a person aggrieved by a decision may appeal. [Citations.] An aggrieved person, for this purpose, is one whose rights or interests are injuriously affected by the decision in an immediate and substantial way, and not as a nominal or remote consequence of the decision. [Citations.] These rules apply with full force to appeals from dependency proceedings." (*In re K.C.* (2011) 52 Cal.4th 231, 236.) "[A] parent has no standing on appeal to seek reversal of the judgment based upon an assertion that the rights of the other parent were violated, unless appellant can also assert that he or she suffered harm [citation]." (1 Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2023) § 2.189.)

Keeping in mind that "[w]e liberally construe the issue of standing and resolve doubts in favor of the right to appeal" (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1053), we conclude Father has standing to challenge whether Mother physically abused T.R. (count a-1) because it forms the basis upon which the juvenile court found Father failed to protect T.R. (count b-1). Father cannot have failed to protect T.R. from Mother's physical abuse if there was no substantial evidence Mother abused T.R. in the first place.

We disagree, however, that Father has standing to challenge the juvenile court's findings that Mother failed to protect T.R. from Father or that Mother emotionally abused T.R. despite his claim that such "finding[s] supported the juvenile court's dispositional order restricting [F]ather's visits to monitored visits in a therapeutic setting." The record does not indicate that the order restricting Father's visits was due to Mother's emotional abuse or failure to protect. Instead, the order

18

was made because T.R. did not feel safe with Father due to his inappropriate discipline and the dynamic between T.R. and her parents. Accordingly, Father lacks standing to challenge the jurisdictional findings of Mother's failure to protect (count b-2) and emotional abuse (count c-1).[7]

Although we find Father lacks standing to challenge two of the grounds as to Mother on which the juvenile court asserted jurisdiction over T.R., we find the remainder of Father's jurisdictional challenges justiciable. The jurisdictional findings as to Father formed a basis for the juvenile court's dispositional orders against Father, which he appeals. "Because reversal of the jurisdictional finding calls into question the validity of orders based on the finding, review of the jurisdictional finding can grant the parent effective relief." (*In re D.P.* (2023) 14 Cal.5th 266, 277.)

2. *Forfeiture*

DCFS argues Father forfeited his challenge to the jurisdictional findings concerning Mother's physical abuse by

---

[7] Citing *In re Esperanza C.*, *supra*, 165 Cal.App.4th at page 1053, Father observes that " '[u]ntil parental rights are terminated, a parent retains a fundamental interest in his or her child's companionship, custody, management and care.' " However, in a more recent opinion, the Supreme Court explained that "*after reunification services are terminated* . . . , 'the parents' interest in the care, custody and companionship of the child [is] no longer paramount.' " (*In re K.C.*, *supra*, 52 Cal.4th at p. 236, italics added.) Here, on June 7, 2023, the juvenile court terminated reunification services. Thus, Father's interest in T.R.'s companionship, custody, and care is insufficient to confer standing to challenge jurisdictional findings as to Mother.

failing to object in the juvenile court. However, Mother argued the juvenile court should dismiss the allegations of her physical abuse for insufficient evidence or should conform them to proof to state a single count of past, inappropriate physical discipline. Thus, the juvenile court had notice of the argument Father now makes on appeal as to Mother's abuse, and the parties had an opportunity to respond to it. The juvenile court rejected Mother's arguments, and Father's repetition of those arguments would have been futile. (*In re S.F.* (2023) 91 Cal.App.5th 696, 725 ["a recognized exception to forfeiture is futility"].) Accordingly, Father is not precluded from challenging the juvenile court's jurisdictional finding of Mother's physical abuse.

**B.**   **Substantial Evidence Supported the Jurisdictional Findings of Mother's Physical Abuse of T.R., Father's Failure to Protect, and Father's Physical Abuse of T.R.**

1.   *Standard of Review*

We review the juvenile court's jurisdictional findings for substantial evidence, which is "evidence that is reasonable, credible and of solid value. [Citations.] We do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding. [Citations.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order. [Citation.]" (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

20

2. *Analysis*

Section 300, subdivision (a), authorizes dependency jurisdiction if a child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. Under subdivision (a), " 'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury." (*Ibid*.) Subdivision (b) states, in relevant part, that jurisdiction is proper if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following: [¶] . . . [t]he failure or inability of the child's parent . . . to adequately supervise or protect the child[; or] [¶] [t]he willful or negligent failure of the child's parent . . . to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left." (*Id*., subd. (b)(1)(A)-(B).)

Father acknowledges Mother hit T.R. with a belt or open hand, but argues these actions were reasonable discipline and isolated incidents, unlikely to recur. Father's appellate argument about Mother's conduct, however, is contradicted by the parents' own admissions. During DCFS's investigation, Father stated Mother had anger management issues, that he stopped Mother from hitting T.R. multiple times, and that he had to intervene to stop Mother twice a week. Mother acknowledged that in disciplining T.R. she "let [her] anger take [her]." Moreover, T.R. and Ana provided evidence that Mother's physical abuse of T.R. was not isolated or limited to reasonable discipline. They reported that Mother hit T.R. a lot, daily, and for every little thing, including passing the wrong salt to Mother. There was also evidence that Mother's discipline resulted in marks on T.R.'s

21

body.  The police observed a bruise on T.R.'s thigh and a bump on her head, which T.R. stated was from Mother kicking and hitting her.  Further, when asked about whether Mother abused T.R., A.R. said her sister's name and pointed to her arm and chin while saying, "blood."  Although there is some suggestion that T.R., Ana, and maternal grandmother exaggerated the abuse, it is not the function of a reviewing court to make credibility determinations or reweigh the evidence.  (*In re R.V.*, *supra*, 208 Cal.App.4th at p. 843.)  The record thus contains substantial evidence that Mother physically abused T.R.

Turning to Father's failure to protect T.R. from Mother's abuse, substantial evidence supported the juvenile court's determination that Father failed to protect.  Although Father claimed that he intervened, other witnesses (including T.R. herself) said that Father did little to intervene unless T.R. was about to become unconscious from the abuse.  Again, it is not our function to make credibility determinations or reweigh competing evidence.  (*In re R.V.*, *supra*, 208 Cal.App.4th at p. 843.)

As to the findings of Father's own physical abuse of T.R., Father acknowledged that he hit her with a belt a few months prior to the initiation of the dependency proceedings and that he pushed her twice for failing her biology test.  Although Father argues his physical discipline was measured, isolated, and unlikely to recur, the evidence before the juvenile court included T.R.'s statements that Father hit T.R. more frequently and violently and for reasons beyond her control.  For example, T.R. stated that Father hit her five times with a closed fist for failing her biology test, used a belt on her approximately once a month, hit her if he thought she did something to A.R., and hit her when she accidentally broke things like a glass or a perfume bottle.

Accordingly, substantial evidence supported the trial court's jurisdictional finding that Father physically abused T.R.

## C.    The Dispositional Orders

### 1.    *Substantial Evidence Supported T.R.'s Removal from Father*

To remove a child from parental custody, the juvenile court must find by clear and convincing evidence that one of five grounds exists pursuant to section 361, subdivision (c).  (*In re V.L.* (2020) 54 Cal.App.5th 147, 154.)  Of relevance here, "[o]ne ground for removal is that there is a substantial risk of injury to the child's physical health, safety, protection or emotional well-being if he or she were returned home, and there are no reasonable means to protect the child."  (*Ibid.*, citing § 361, subd. (c)(1).)

"[W]hen there is a substantial evidence challenge [to a finding subject to the clear and convincing evidence standard], the reviewing court must determine whether the record contains substantial evidence from which a reasonable trier of fact could find the existence of that fact to be highly probable."  (*In re V.L.*, *supra*, 54 Cal.App.5th at p. 149; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996 ["when reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true"].)

Here, the same evidence that supported the jurisdictional findings against Father constituted substantial evidence supporting the juvenile court's order removing T.R. from Father's custody.  T.R. suffered physical injuries from Mother's abuse,

23

from which Father failed to protect her. Moreover, T.R.'s suicidal ideations and her refusal to visit with Father indicated that Father's physical abuse and failure to protect T.R. from Mother's physical abuse negatively impacted her emotional well-being. T.R. indicated she did not feel safe with Father, repeatedly stated she did not want to return home, and even threatened to kill herself if she were required to do so. Thus, the trial court did not err in removing T.R. from Father's custody.

2. *The Juvenile Court Did Not Err in Ordering Monitored Visitation in a Therapeutic Setting*

Father argues that instead of a minimum of one hour of monitored visitation per week in a therapeutic setting, the juvenile court should have ordered "unmonitored visits twice a week for two hours each visit, or in the alternative, monitored visits in a non-therapeutic setting." " 'Visitation shall be as frequent as possible, consistent with the well-being of the child.' [Citation.] The power to regulate visits between dependent children and their parents rests with the juvenile court and its visitation orders will not be disturbed on appeal absent an abuse of discretion." (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1070.) We may not disturb the juvenile court's visitation orders unless the court exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. (*In re J.M.* (2023) 89 Cal.App.5th 95, 113.)

Father first argues the court's visitation order was not warranted because he reasonably disciplined T.R. and any incident of abuse was isolated and unlikely to recur. We reject this argument as inconsistent with the court's jurisdictional finding of Father's physical abuse, which substantial evidence supported.

24

Next, Father argues that although T.R. "was mildly depressed, she was not suffering severe emotional damage under the code and did not need a therapist present." Father claims unmonitored, longer, and more frequent visits were necessary to rebuild his bond with T.R.

An order limiting visitation to a therapeutic setting is not limited only to situations where a minor is experiencing severe emotional damage. Visitation in a therapeutic setting here was rationally related to T.R.'s best interests; even if T.R.'s depression is mild, she had recently expressed suicidal ideation related to Father and Mother's treatment of her. Additionally, at the time of the court's visitation order, T.R. remained afraid of her parents and refused to visit with them at all. Father's suggestion at the dispositional hearing that T.R. be returned to the parents' custody demonstrated a lack of insight into T.R.'s emotional fragility. Thus, monitored visitation with later increases in frequency and duration of the visits as T.R.'s level of comfort with her parents increased was appropriate, and the court granted DCFS discretion to liberalize the visits. Father has not demonstrated the juvenile court's visitation order was arbitrary, capricious, or absurd.

3. *Father Forfeited His Objections to the Case Plan*

Father argues the juvenile court abused its discretion in ordering counseling and parenting classes. At the dispositional hearing, however, except for anger management courses, Father submitted to DCFS's case plan recommendations, which included Father's participation in individual counseling, family counseling when deemed appropriate by a therapist, and parenting classes. Thus, Father forfeited his objection to the order that he participate in counseling and parenting classes. (*In re N.M.*

25

(2011) 197 Cal.App.4th 159, 167 ["submitting the dispositional issue based on the social worker's recommendation . . . precludes the parent from challenging the evidence to support the dispositional order"].)  Father's argument relating to the anger management classes is moot because the juvenile court clarified that its June 7, 2022 dispositional orders did not require Father to take anger management classes.

## D.      DCFS's Failure to Fulfill Its Initial Duty of ICWA Inquiry Was Harmless

The juvenile court and DCFS "have an affirmative and continuing duty to inquire whether a child for whom a [section 300] petition . . . has been filed, is or may be an Indian child."[8] (§ 224.2, subd. (a).)  This "duty to inquire begins with the initial contact" by DCFS.  (*Ibid*.)  Additionally, section 224.2, subdivision (b) states, in part, that "[i]nquiry includes, but is not limited to, asking . . . extended family members [and] others who have an interest in the child . . . whether the child is, or may be, an Indian child . . . ."  Under ICWA, the term " 'extended family member' " is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of [18] and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or

_____

[8] An "Indian child" is an unmarried person under 18 years of age who is (1) a member of a federally recognized Indian tribe or (2) is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe.  (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [adopting federal definitions], subd. (b) [expanding the age range stated in the federal definition to include persons over 18, but under 21, years of age].)

sister-in-law, niece or nephew, first or second cousin or stepparent." (25 U.S.C. § 1903(2).)

Father argues DCFS did not conduct an adequate inquiry under section 224.2, subdivision (b) because it did not ask maternal grandmother, Ana, or maternal second cousin Erika about T.R.'s possible Indian heritage. DCFS concedes it did not fulfill this duty. We agree: the record does not disclose any ICWA inquiry of these maternal extended relatives.

As prior decisions make clear, in the view of our division, DCFS's failure to inquire of such extended family members does not result in automatic reversal. (See *In re Adrian L.* (2022) 86 Cal.App.5th 342; *In re A.C.* (2022) 75 Cal.App.5th 1009; *In re S.S.* (2022) 75 Cal.App.5th 575; *In re Darian R.* (2022) 75 Cal.App.5th 502.) Ordinarily, we evaluate the record to determine whether " 'the probability of obtaining meaningful information is reasonable in the context of ICWA.' " (*In re Darian R.*, *supra*, at p. 509, quoting *In re Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) Information available from extended family members must be both "readily obtainable," and "likely to bear meaningfully upon whether the child is an Indian child." (*In re Benjamin M.*, *supra*, at p. 744.) In making this determination, we have rejected "a wooden approach to prejudice" (*In re A.C.*, *supra*, at p. 1017) and refused to require further inquiry when, based upon the particular circumstances presented by the record, it is apparent "that additional information would not have been meaningful to the inquiry" (*In re Benjamin M.*, *supra*, at p. 743; see, e.g., *In re S.S.*, *supra*, at p. 582).

Here, the three maternal extended family members at issue were readily available to DCFS. However, the family's immigration to the United States from El Salvador

27

approximately 15 years ago, before T.R. was born, makes it highly unlikely that T.R. is an Indian child. The " 'definition of "Indian child" ' " is not based on ancestry, but rather " 'on the child's *political ties* to a federally recognized Indian Tribe, either by virtue of the child's own citizenship in the Tribe, or through a biological parent's citizenship and the child's eligibility for citizenship.' " (*In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1009.) Because both parents were born in El Salvador and the family did not come to the United States until 2007 or 2009 after T.R. was born, it is not reasonably probable that Mother or her parents were a member of a federally recognized tribe in the United States. (*In re G.A.* (2022) 81 Cal.App.5th 355, 365 [where the father was born in Mexico, the possibility that a paternal ancestor was a member of a federally recognized Indian tribe was too speculative to support reversal based on agency's failure to inquire of paternal relatives], review granted Oct. 12, 2022, S276056.) Because there is no reasonable probability that additional inquiry would have yielded meaningful information, DCFS's failure to inquire of maternal extended family members was harmless. (See *In re Darian R.*, *supra*, 75 Cal.App.5th at pp. 509-510.)

## DISPOSITION

The juvenile court's order is affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

CHANEY, J.

BENDIX, Acting P.J.